FILED

2020 Aug-27  PM 02:36
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| RAYMOND KENT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.:  2:18-cv-00734-JHE |
| | ) | |
| CITY OF BIRMINGHAM, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION[1]**

Plaintiff Raymond Kent ("Kent") brings this action against his employer, Defendant City of Birmingham ("City"), alleging unlawful employment discrimination and retaliation pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, and 42 U.S.C. § 1981. The City moves for summary judgment pursuant to Federal Rule of Civil Procedure 56, contending there are no genuine issues of material fact and that the City is entitled to judgment as a matter of law. (Doc. 30). The motion is fully briefed and ripe for review. (Docs. 30, 34, & 35). For the reasons stated below, the City's motion for summary judgment (doc. 30) is **GRANTED**.

**I. Standard of Review**

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including trial and the entry of final judgment. (Doc. 9)

bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish there is a "genuine issue for trial." *Id.* at 324. (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor). Any factual disputes will be resolved in Plaintiff's favor when sufficient competent evidence supports Plaintiff's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276-78 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of the events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mtn. Park, Ltd. v. Oliver*, 836 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II. Summary Judgment Facts

The City of Birmingham ("City") is a municipal corporation under the laws of the State of Alabama. (Doc. 27 at ¶1). The City has an Equal Employment Opportunity policy that precludes

2

using race in decision-making and also precludes retaliation for complaints of discrimination. (Doc. 30-2 at 2).   Kent is a white male who is presently employed by the City as a security guard. (Doc. 30-3 at 2; doc. 30-4 at 12 (37:8-19)).

Arlington Antebellum Home ("Arlington House") is a historic structure, built in the 1850s, located in Birmingham.   (Doc. 30-5 at 29 (105:2-15)).   Arlington House is operated by a small staff consisting of two administrative personnel, a cook, a laborer, and four security guards.   (Doc. 30-4 at 120).   Toby H. Richards ("Richards"), female, is the current Director of Arlington House. (Doc. 30-5 at 29 (103:1-11)).   Stephen Moode ("Moode") is a white male who served as Director of Arlington House from 2010 to 2018.   (*Id.* at 6 (13:14-23); *see* doc. 20 at ¶15).

Kent began his employment with the City at Arlington House as a security guard in April 2009.   (Doc. 30-6 at 2).   Kent primarily worked alone from 12:00 AM (midnight) to 8:00 AM. (Doc. 30-4 at 10 (28:13-23)).   One of Kent's essential duties as a security guard was to patrol and inspect the building and grounds for evidence of unauthorized entry, fire, vandalism, or theft and report emergency situations to a supervisor or proper authorities.   (Doc. 30-4 at 69).

## A.  Discipline Kent Received

Kent was disciplined or counseled on the following occasions while employed at Arlington House,[2] beginning as early as 2011:

a.  On March 31, 2011, Kent received a written reprimand for opening another employee's mail.  (Doc. 30-7 at 2).

b.  On March 31, 2011, Kent received a second written reprimand for failing to report to work or contact his supervisor if he was unable to work.  (Doc. 30-7 at 3).

---

[2] Although Kent states that these statements are "[d]isputed," he cites only document 30-4 at pp. 3-4.  (Doc. 34 at 6).  Those pages are the introductory pages to his deposition, which do not create a disputed factual issue.

c.  On October 4, 2013, Kent received a written reprimand for "unbecoming behavior." (Doc. 30-7 at 4).  Specifically, Moode noted that he received a complaint that Kent had used "extremely crude language" and was "very rude." (*Id.*).

d.  On November 5, 2013, Kent received a written reprimand for failing to follow the Director's instructions.  (Doc. 30-7 at 7).

e.  On June 10, 2015, Kent received instructions regarding several work-related areas of employee expectations.  (*Id.*).

f.  On September 18, 2015, Kent received counseling concerning thermostat operation.  (*Id.*).

g.  On October 6, 2015, Kent received an email from Moode concerning feeding stray cats. (Doc. 30-7 at 5).

h.  On January 20, 2017, Kent received a Decision Upon Determination Hearing, which stated he was suspended without pay for ten days for multiple failures to notify a supervisor, including failure to  notify a supervisor that he was leaving the grounds, he was late for work, and that he was leaving work.  (*Id.* at 11).

i.  On July 20, 2017, Kent received another Decision Upon Determination Hearing, which stated he was suspended without pay for six days for failure to comply with his supervisor's instructions.  (*Id.* at 9).

j.  On September 28, 2018, Kent received a third Decision Upon Determination Hearing, which stated he was suspended for sleeping while on duty.  (*Id.* at 10).  Kent asserted he was not sleeping, but suffers from narcolepsy and seizures, although he admitted to having not informed anyone at Arlington House of this condition.  (*Id.*).

**B.  Kent's Incidents with Other Employees**

Gary Cooper ("Cooper") is a white male that is employed as a security guard at Arlington

House.  (Doc. 30-4 at 14 (42:7-8)).  Eric Wright ("Wright") is a black male that was employed as a security guard at Arlington House.  (*Id.* at 17 (57:1-2)).  Eric Griffin ("Griffin") is a black male that is employed as a security guard at Arlington House.  (*Id.* (57:2-3)).  Lashaunda Brundidge ("Brundidge") is a black female that is employed with the City of Birmingham Department of Public Works.  (Doc. 30-2 at 4).

On May 20, 2015, Wright filed a complaint with HR against Kent, claiming Kent was harassing him with "erratic and somewhat troubling" behavior when Kent is not on shift.[3]  (Doc. 30-4 at 115-116).  Cooper filed a complaint against Kent with the Birmingham Police Department claiming Kent physically assaulted him on September 9, 2015.[4]  (Doc. 30-4 at 110, 114).    In September 2015, Cooper and Kent got into a physical altercation where Cooper attempted to choke Kent.  (Doc. 30-4 at 13-14 (41:12-43:21)).  Kent reported the incident to Moode, who told him to stay away from Cooper and he would deal with it when he got there.  (*Id.*).  Once Moode arrived, he instructed Cooper and Kent to stay away from each other.  (*Id.* at 14 (45:11-20).  On January 10, 2016, Cooper filed a complaint with HR against Kent, claiming Kent was harassing him.[5] (Doc. 30-8 at 2).

Emantic Bradford, Sr. ("Bradford"), a black male, was employed as a Food Service Supervisor at Arlington Home from September 1, 2016 until October 26, 2018.  (Doc. 30-9 at 2).[6]

---

[3] Kent states that this fact is "[d]isputed," but gives no citation to create a factual dispute. (Doc. 34 at 6).  Instead, Kent states that there is no evidence the City investigated Wright's complaint or that findings were made.  (*Id.*).  Even if true, this does not adequately dispute the fact that Wright made such a complaint.

[4] Without citation, Kent "[d]isputed" this fact by stating Cooper failed to report the incident to police until January 20, 2016, and again asserts there is no evidence the City investigated Cooper's complaint or that findings were made.  (Doc. 34 at 6).  This does not create a disputed fact.

[5] Again, Kent asserts this statement is "[d]isputed" but offers no citation and his explanation does not actually dispute the substance of the statement.  (Doc. 34 at 6).

[6] Kent moves to strike Bradford's affidavit arguing that everything Bradford attested to is

5

Bradford testified that around December 2016, Director Moode delegated authority to him to supervise the Arlington House guards, which continued until about August 2017. (*Id.*). Moode testified that, at the time Bradford issued disciplines, he did not realize Bradford could not have authority over the guards or to convene determination hearings. (Doc. 30-5 at 13 (39:6-40:23)). However, Jennifer Samuelson, a human resources employee, later informed Moode that Bradford did not have authority over the guards. (*Id.*). For purposes of summary judgment, Bradford did not have authority to discipline Kent; however, that does not mean that Bradford did not issue disciplinary notices when everyone believed he had the authority to do so or that the underlying conduct did not happen.

In December 2016, Kent reported that Brundidge allegedly threatened him with a pair of scissors. (Doc. 30-2 at 4; doc. 30-4 at 18-19 (58:11-63:14)). HR reported that the allegations could not be substantiated. (Doc. 30-2 at 4). Kent testified that after the incident, he was instructed to leave work early, losing an hour of pay. (Doc. 30-4 at 19 (64:1-3)). To Kent's knowledge Brundidge was not disciplined but counseled to stay away from Kent. (*Id.* (65:8-9)).

## C. Discipline Kent Received in 2017 and Other Complaints

In January 2017, Bradford disciplined Kent for two instances where Kent failed to report being away from the grounds to his supervisor, by suspending him for ten days. (Doc. 30-9 at 2-3). Kent did not appeal. (*Id.* at 3). On March 20, 2017, Kent filed a police report with the

---

false because he did not have authority to discipline Kent or conduct determination hearings resulting in any type of punishment. (Doc. 24 at 7). The motion to strike is **DENIED**. Federal Rule of Civil Procedure 56(c)(4) provides that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Bradford's affidavit meets this standard. To the extent Bradford's testimony regarding his authority creates a disputed issue of fact, that fact will be weigh in Kent's favor, as the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, (1970); *see also Anderson*, 477 U.S. at 255.

Birmingham Police Department claiming that Bradford threatened him by calling him (Kent) a liar and telling him that they would have "problems."  (Doc. 30-10 at 2-3).  Bradford disciplined Kent on April 4, 2017, by suspending him for two days when Kent failed to report an open gate and broken glass and nails in the Arlington House parking lot.  (Doc. 39-9 at 3 & doc. 30-11 at 2). However, Kent appealed, and the discipline was rescinded through a settlement agreement, signed by counsel for Kent and an attorney for the City.  (Doc. 30-11 at 2-3).  On June 13, 2017, Kent filed a police report with the Birmingham Police Department claiming that Cooper struck him with his (Cooper's) vehicle.  (Doc. 30-12 at 2-3).

On July 6, 2017, after Kent had arrived for his shift, Bradford yelled at Kent about a city vehicle's damaged tires, accusing Kent of tampering with the tires, and threatened to have Kent arrested and fired after he looked into it.  (Doc. 30-4 at 25-26 (89:16-91:20)).  Kent was never arrested, disciplined, or fired for this incident.  (*Id.*).

On July 15, 2017, Cooper shoved Kent in front of Bradford and Germaine Norman, the payroll coordinator.  (Doc. 30-4 at 27 (96:5-23)).  Neither of the parties point to anything that occurred (or did not occur) as a result of this incident.

On July 21, 2017, Moode suspended Kent for six days for feeding stray cats.  (Doc. 30-7 at 9).  The Jefferson County Personnel Board upheld the disciplinary action, but reduced the suspension to four days.  (Doc. 30-13 at 2).  Kent, along with others, was warned not to feed the cats on October 6, 2015, November 29, 2016, and March 14, 2017.  (Doc. 30-4 at 138, 141-42). On October 18, 2015, Kent noted he observed "wild animals" on the grounds, but also noted he "[o]rdered wild animals to vacate museum property."  (*Id.* at 139).

At a meeting in March 2017, Bradford provided security staff with a printed out copy of the rules and security staff were required to sign that they received it.  (Doc. 30-4 at 28-29 (101:7-

102:19)).  Bradford threw the signature sheet back at Kent four times because Bradford did not approve of how Kent signed only his last name (which is what he usually does).  (*Id.*).

On August 12, 2017, Kent filed a complaint with HR claiming that Bradford called him a "punk bitch."  (Doc. 30-14 at 2).

Kent also asserts that Bradford contacted Kent's wife through social media.  (Doc. 30-4 at 29-30 (105:17-107:22)).  Specifically, Kent testified Bradford sent his wife a "friend request" on Facebook and attempted to call her twice through Facebook.  (*Id.*).  Bradford also sent her a message that said he would help her get child support from Kent.  (*Id.*).  Kent's wife did not respond and "blocked" Bradford.  (*Id.*).

### D.  August 7, 2017 EEOC Charge of Discrimination and/or Retaliation

On August 7, 2017, Kent filed an EEOC Charge of Discrimination (Charge No. 420-2017-02672) claiming race discrimination and retaliation, alleging Bradford subjected him to harassment intimidation, racial slurs, assaults, threats, and retaliatory discipline.  (Doc. 30-4 at 117).  Kent's August 7, 2017 EEOC Charge is based on the following:

a.  On February 13, 2017, Bradford accused Kent of tampering with a fuse box;

b.  On June 11, 2017, Cooper hit Kent with a city vehicle and Bradford took no action;

c.  On July 15, 2017, Cooper shoved Kent from behind and Bradford took no action;

d.   On July 21, 2017, Kent was suspended for six days for feeding stray cats and failing to secure the Arlington House grounds when large nails damaged a city truck; Bradford allegedly yelled at Kent "take a good look, this is vandalism, somebody is going to jail."

(*Id.*).

### E.  Kent's Complaints Between his EEOC Charges

On November 3, 2017, Kent filed a complaint with HR claiming that Bradford told him to

"get his punk ass out of the way, bitch." (*Id.* at 3).

Kent also complained of an ongoing problem that involved other employees filling up the toilets with feces and urine and leaving them for Kent to clean up. (Doc. 30-4 at 28 (98:20-100:17)). Kent reported the issue to Bradford, but does not think anything was done about it. (*Id.*). Kent testified Bradford called him a "nasty fucker" for taking pictures of the incidents. (*Id.*).

**F. November 28, 2017 EEOC Charge of Discrimination and/or Retaliation**

On November 28, 2017, Kent filed a second EEOC Charge of Discrimination (Charge No. 420-2018-00602) claiming race discrimination and retaliation. (Doc. 30-4 at 124). Kent based his November 28, 2017 EEOC Charge on the following:

a. On August 12, 2017, Bradford allegedly shouted at Kent and called Kent a "punk bitch." Kent reported the incident to Director Moode and HR.

b. On August 22, 2017, Kent allegedly received an email from Payroll Director, Germaine Norman, informing him that there was no time clock record for him working on August 10, 2017, when Kent had worked that day.

c. On August 18, 2017, Kent allegedly was unable to clock in for his scheduled shift.

d. On November 2, 2017, Bradford allegedly cursed at Kent, yelling "get [his] punk ass out of the way, bitch." Kent reported the incident to Director Moode and HR.

e. Kent alleged that he was not receiving his check stubs.

f. Kent alleged that Bradford and Cooper were parking their vehicles so close to Kent's vehicle that it was difficult for Kent to leave the grounds and he felt intimidated.

(*Id.*).

**G. Additional Complaints after the Second EEOC Charge**

On November 31, 2017, Kent filed a complaint with HR claiming that he had not received

check stubs.  (Doc. 30-14 at 4-5). On December 14, 2017, Kent filed a complaint with Director Moode alleging that Wright was asleep while on duty with a handgun in his lap and that the men's restroom was filed with feces and urine.  (Doc. 30-14 at 6).  Kent claims these were purposeful and done to create a hostile work environment for him.  (*Id.*).   On July 12, 2018, Kent filed a complaint with HR claiming that Wright purposefully locked the female restroom at Arlington House, which forced a female contract guard to use the men's restroom.  (*Id.* at 9).   On July 19, 2018, Kent filed a complaint with HR again claiming that the female restroom was locked, forcing the female to use the men's restroom.  (*Id.* at 11).  Kent claimed this was retaliatory for him filing an EEOC Charge.  (*Id.*).   On July 30, 2018, Kent filed an HR complaint, claiming he was not receiving his check stubs in a timely manner.  (*Id.* at 13).  He claimed this was a retaliatory action for filing an EEOC Charge.  (*Id.*).

On August 19, 2018, Kent filed a complaint with HR claiming that Director Toby Richards was creating an unsafe environment for Kent by authorizing the dismantling of a deadbolt on the security office door of Arlington House.  (Doc. 30-14 at 20).  Kent claimed this was done as punishment or retaliation.  (*Id.*).  On August 26, 2018, Kent filed a complaint with HR claiming that he observed cat food in the carriage house and that Arlington House management did not discipline anyone for the cat food.  (*Id.* at 23).  Again, Kent claimed this was retaliation for him filing an EEOC Charge.  (*Id.*).

On August 25, 2018 and August 27, 2018, Kent was alleged to have been found sleeping during his assigned shift.  (Doc. 30-7 at 10).  Director Richards suspended Kent for fifteen days. (*Id.*).  The Jefferson County Personnel Board upheld the disciplinary action, but reduced the suspension to ten days.  (Doc. 30-15 at 2).

Jennifer Samuelson ("Samuelson"), an Employee Relations Advisor for the City's Human

Resources Department, testified that Kent's complaints were thoroughly investigated.[7]  (Doc. 30-2 at 4).  Samuelson stated that most of Kent's allegations were not substantiated.  (*Id.*).  Kent's December 14, 2017 complaint regarding Wright was partially substantiated by photos showing Wright sleeping while on duty.  (*Id.*).  HR did not determine that Wright had a weapon at the time.  (*Id.*).  Moode disciplined Wright for the infraction.[8]  (*Id.*).

### III. Analysis

Kent brings this action against the City claiming unlawful employment discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, and 42 U.S.C. § 1981.[9]  (Doc. 20).  Kent, a Caucasian male, alleges he was subjected to discriminatory treatment based on his race.  (*Id.* at 13).

### A.  Hostile Work Environment Claim

Federal employment laws do not operate as a "general civility code." *Lockett v. Choice Hotels, Int'l, Inc.*, 315 Fed. Appx. 862, 865 (11th Cir. 2009).  Instead, only mistreatment is "sufficiently severe or pervasive" that it can be said to alter the terms, conditions, or privileges of employment.  *See Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  To establish such a hostile work environment claim, a plaintiff must demonstrate:

> (1) that he belongs to a protected group; (2) that he has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected

---

[7] Kent responds that this statement is "[d]isputed," but provides no citation to the record. (Doc. 34 at 9).  Without citation to the record showing a factual dispute, there is no dispute.

[8] Again, Kent responds that this statement is "[d]isputed," but provides no citation to the record.  (Doc. 34 at 10).  Without citation to the record showing a factual dispute, there is no dispute.

[9] Because both Title VII and § 1981 have the same requirements of proof and use the same analytical framework, *see Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998), the undersigned will expressly address the Title VII claims with the understanding the analysis also applies to the § 1981 claims, unless expressly indicated otherwise.

characteristic of the employee ...; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or direct liability.

*McCann v. Tillman*, 526 F.38, 1370, 1378 (11th Cir. 2008) (quoting *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002)).

### 1. Scope of the Claim

The City argues that allegations outside of Kent's August 7, 2017 EEOC Charge should not be considered.  (Doc. 30-1 at 16).  Specifically, the City argues Kent failed to attach the Notice of Right to Sue Letter for his November 28, 2017 Charge of Discrimination to the amended complaint.  (*Id.*).   The City also complains that Kent never attached the November 28, 2017 Charge of Discrimination.  (*Id.*).

Before filing a Title VII action, a plaintiff must exhaust his administrative remedies by filing a charge of discrimination with the EEOC. *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 460 (5th Cir. 1970); *see also Alexander v. Fulton Cnty., Ga.*, 207 F.3d 1303, 1332 (11th Cir.2000). The purpose of this prerequisite "is that the [EEOC] should have the first opportunity to investigate the alleged discriminatory practices to permit it to perform its role in obtaining voluntary compliance and promoting conciliation efforts." *Gregory v. Ga. Dept. of Human Resources*, 355 F.3d 1277, 1279 (11th Cir. 2004) (quoting *Evans v. U.S. Pipe & Foundry Co.*, 696 F.2d 925, 929 (11th Cir. 1983)). Judicial claims are allowed if they "amplify, clarify, or more clearly focus" the allegations in the EEOC complaint[;]" however, "allegations of new acts of discrimination are inappropriate." *Id.* (citing *Wu v. Thomas*, 863 F.2d 1543, 1547 (11th Cir. 1989)). Courts are "extremely reluctant to allow procedural technicalities to bar claims brought under [Title VII]," Sanchez, 431 F.2d at 460, and have noted that "the scope of an EEOC complaint should not be

strictly interpreted." *Id*. at 465. However, a "plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Alexander*, 207 F.3d at 1332.

There is no dispute Kent filed two Charges of Discrimination with the EEOC during his employment as a security guard at Arlington House.  Kent has provided the court with his November 28, 2017 Charge.  (Doc. 30-4 at 124).  This Charge, along with the August 7, 2017 Charge, provided the requisite notice to the City and allowed the EEOC to have the first opportunity to investigate.   Kent's failure to attach his second charge to the amended complaint is not a sufficient basis to limit his allegations.

As for how far to look back, Alabama is a non-deferral state, and a Charge of Discrimination must be filed within 180 days "after the alleged unlawful employment practice occurred."  42 U.S.C. § 2000e-5(e)(1); *Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, 421 F.3d 1169 (11th Cir. 2005).  Therefore, the general rule is that only those incidents that occurred within 180 days of an operative EEOC Charge can be the basis for Title VII liability.  In this case, that means events that occurred before February 2, 2017, would not be considered.  Thus, no incident that occurred before February 2, 2017 can be the basis of a disparate treatment claim.  *Nat'l R.R. Pass. Corp. v. Morgan*, 536 U.S. 101, 110 (2002).  Hostile work environment claims are different. Since a hostile work environment claim is composed of a series of separate acts that collectively constitute one unlawful employment practice, the timely filing provision only requires that the Title VII plaintiff file a charge within 180 days after the lawful practice happened.  *Id.* at 116-17. It does not matter that some of the component acts fall outside the statutory period.  *Id.* at 117. Therefore, in considering Kent's hostile work environment claim, discriminatory acts that occurred prior to February 2, 2017, may be considered.

### 2.   Merits of Kent's Claim

The City concedes that Kent belongs to a protected group but denies he has presented evidence to establish any of the remaining elements of a hostile work environment claim.   (Doc. 30-1 at 12).   To survive summary judgment, Kent must present some evidence that he was subjected to unwelcome harassment, that harassment was based on a protected characteristic, and the harassment was so severe or pervasive that it altered the terms and conditions of employment and created a discriminatorily abusive working environment.  *McCann*, 526 F.3d at 1378 (quoting *Miller*, 277 F.3d at 1275).   Kent must also present evidence that the City is liable for such a hostile environment.   (*Id.*).

Viewing the evidence in Kent's favor, it is apparent that Kent was subjected to some unwelcomed harassment at work. There is, however, little or no evidence that the harassment was based on Kent's race or that it was so severe or pervasive that it altered the terms and conditions of his employment.   There is a lack of evidence to support holding the City liable here.   Human Resources investigated each of Kent's complaints, finding most were not substantiated.  (Doc. 30-2 at 4).   Notably, Kent's complaints about not receiving his check stubs were determined to be the result of a miscommunication between Kent and the payroll coordinator.  (*Id.*).

### a.   No Evidence Harassment Was Based on a Protected Characteristic

It is a "bedrock principle that not all objectionable conduct or language amounts to discrimination under Title VII." *Reeves v. C.H. Robinson Worldwide, Inc*., 594 F.3d 798, 809 (11th Cir.2010) (en banc). Therefore, only conduct that is "based on" a protected category, such as race, may be considered in a hostile work environment analysis. *See Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 584 (11th Cir.2000), abrogated on other grounds by *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). "Innocuous statements or conduct, or boorish ones that do not

relate to the [race] of the actor or of the offended party (the plaintiff), are not counted." *Id.* at 583; *see also Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1301–02 (11th Cir.2007) ("Title VII does not prohibit profanity alone, however profane. It does not prohibit harassment alone, however severe and pervasive. Instead, Title VII prohibits discrimination, including harassment that discriminates based on a protected category...."). This "inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by its target." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998).

As an initial matter, there is no evidence that any of the altercations with Cooper were because of Kent's race.[10] Cooper and Kent are both white. While it is not inconceivable for a person to discrimination against another person of his race, there is absolutely no evidence to support the inference that any of Cooper's harassment was based on race.

Kent also asserts that in December 2016, Brundidge, a black female employed by the Public Works Department, threated Kent with a pair of scissors. (Doc. 30-2 at 4; doc. 30-4 at 18-19 (58:11-63:14)). HR investigated Kent's complaint and reported that the allegations could not be substantiated. (Doc. 30-2 at 4). Kent testified that after the incident, he was instructed to leave work early, losing an hour of pay. (Doc. 30-4 at 19 (64:1-3)). To Kent's knowledge Brundidge was not disciplined, but counseled to stay away from Kent. (*Id.* (65:8-9)). Kent fails to present evidence to explain how this event was racially motivated.

Most of the incidents of harassment in the record were perpetrated by Bradford, a black man. The fact that Bradford is black and that Cooper is white is the only support for the inference that any of this harassment was based on race. While Kent generally asserts that Bradford's

---

[10] Kent's August 7, 2017 Charge contains two alleged incidents involving Cooper. (Doc. 20 at 34). Specifically, Kent complains Cooper assaulted him on June 11, 2017, by striking him with a vehicle and physically assaulting him on July 15, 2017. (*Id.*).

conduct was because of his race, there is simply no connection in the evidence. Kent had problems with co-workers and received discipline before working with Bradford.  Additionally, all of the discipline Kent received from Bradford was upheld after a hearing by an independent personnel board, even if two of the suspensions were reduced in time.

In his brief, Kent argues that Bradford, who "acted without authority as [Kent's] supervisor, subjected him to verbal abuse, intimidation, and threats of termination."  (Doc. 34 at 15).  In support, Kent cites a portion of Director Moode's deposition.  (*Id.*).  Moode testified that he never told Bradford that he (Bradford) was director of Arlington House.  (Doc. 30-5 at 11 (33:20-23)).  The cited testimony further addresses a March 31, 2017 Notice of Determination Bradford issued wherein Kent was written up for failing to inform Bradford of the gate being left open or that there was glass and nails in the parking lot.  (*Id.* at 12-13 (34:1-40:23)).  Moode's testimony does not address any racial motivation, only that Moode eventually learned Bradford did not have disciplinary authority.  (*Id.* at 13 (38:13-40:23)).  Kent, citing his amended complaint, then asserts that he specified several incidents that he reported to supervisors or to Human Resources that were not remedied or otherwise addressed.  (Doc. 34 at 15 (citing doc. 20 at ¶¶17-43)).  However, the City has presented evidence that its Human Resources department investigated all of the complaints it received from Kent.  (Doc. 30-2 at 4).  And, Kent points to no evidence otherwise.

At summary judgment, the moving party bears the burden of pointing to the part of the record that shows the absence of a genuine issue of material fact. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir.1997). The City has done this by pointing to the lack of evidence that the alleged harassment was based on Kent's race and that the alleged harassment was sufficiently severe and pervasive to alter the terms and

conditions of Kent's employment.  (Doc. 30-1 at 12-16).  Once the moving party establishes the absence of a genuine issue of material fact, the burden shifts to the nonmoving party to go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  Specifically, the nonmoving party, here Kent, must "come forward with significant, probative evidence demonstrating the existence of a triable issue of fact." *Chanel, Inc. v. Italian Activewear of Fla., Inc*., 931 F.2d 1472, 1477 (11th Cir.1991).

The only other part of Kent's brief that addresses his hostile work environment claim exclusively focuses on the allegations in Kent's complaint.  (Doc. 34 at 16).  Kent asserts his amended complaint contains "plausible allegations" that his supervisor, a black man, "contributed and condoned" a "hostile work environment because [Kent] is white." (*Id.*).  Kent also cites his amended complaint stating that black employees were treated differently.  (*Id.*).  Kent asserts, without citation, that the City can be held liable because he made reports to his supervisor and Human Resources, that the Human Resources affidavit shows that some of his complaints were substantiated, and that it shows Human Resources failed to investigate his hostile work environment claim.  (*Id.*).  Kent also asserts, without citation, that Moode testified he did not investigate all of Kent's hostile work environment claims.  (*Id.*).

Viewing all of the evidence in Kent's favor, he has simply failed to point to any evidence that any of the harassment he received was because of his race.  At this stage in the litigation, the court is no longer accepting the allegations in the complaint as true.  While the amended complaint contains allegations that Bradford and other co-workers called Kent a white devil, cracker, wonderbread, mayo, Adolf Hitler, and Casper (doc. 20 at ¶¶ 34, 66, 98), Kent never points to any evidence of this in opposition to summary judgment.  (*See* doc. 34).

Having scoured the evidence, Kent's first EEOC Charge does mention having been

subjected "harassment and intimidation by . . . Bradford (black male), co-workers, and members of the grounds crew." (Doc. 30-4 at 117. It also complains Kent was "subjected to racial slurs." (Doc. 30-4 at 117). However, there are no specifics provided. There is no account of who said what, when they said it, or how often such slurs were made. There is simply not the type of evidence from which the undersigned can conclude that there is a triable issue of fact as to whether the alleged harassment was based on race or whether the alleged race-based harassment was sufficiently severe or pervasive to alter the terms or conditions of employment. *See generally Glasscox v. City of Argo*, 903 F.3d 1207, 1213 (11th Cir. 2018) ("Conclusory allegations and speculation are insufficient to create a genuine issues of material fact."). For either of these reasons, summary judgment is due to be granted on Kent's hostile work environment claim.

### B. Disparate Treatment Race Discrimination Claim

Kent alleges he was subjected to discriminatory discipline on four occasions: (1) the April 4, 2017 two-day suspension for failing to keep grounds secure; (2) the January 20, 2017 ten-day suspension for leaving the premises without permission; (3) the July 20, 2017 six-day suspension for feeding stray cats and damage to a city vehicle; and (4) the September 20, 2018 fifteen-day suspension for sleeping on duty. (Doc. 20).

When, as here, there is no direct or statistical evidence of discrimination, a plaintiff may identify circumstantial evidence to overcome summary judgment. A plaintiff may use the burden shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981) to establish a disparate treatment claim. Under *McDonnell Douglas*, a plaintiff first must establish a prima facie case by presenting evidence that (1) he is a member of a protected class; (2) he was subjected to an adverse employment action; (3) his employer treated similarly situated employees outside of his class more

18

favorably; (4) he was qualified to do the job. *Maynard v. Bd. of Regents of Div. of Fla. Dept. of Educ.*, 342 F.3d 1281, 1289 (11th Cir. 2003) (citing *McDonnell Douglas*, 411 U.S. at 802). "The successful assertion of a *prima facie* case then creates a rebuttable presumption that the employer unlawfully discriminated against the plaintiff." *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1275 (11th Cir. 2008) (internal quotation marks and citations omitted).

If the plaintiff establishes a *prima facie* case, then the burden shifts to the employer to produce evidence of a legitimate, non-discriminatory reason for the challenged action. *Rioux*, 520 F.3d at 1275. The employer's burden is very light. *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 769 (11th Cir. 2005). If the employer satisfies its burden, then the burden shifts back to the plaintiff to prove that the employer's "proffered reason really is a pretext for unlawful discrimination." *Rioux*, 520 F.3d at 1275 (internal quotation marks and citations omitted).

The City concedes that Kent has presented sufficient evidence that he belongs to a protected class and that he was qualified to do the job. (Doc. 30-1 at 20). The City asserts that there is insufficient evidence to establish Kent was subjected to an adverse employment action and that the City treated similarly situated employees outside of his class more favorably.[11] (*Id.*) The

---

[11] Kent cites *Hand v. University of Ala. Board of Trustees*, 304 F. Supp. 3d 1173, 1179 (N.D. Ala. 2018), for the proposition that the lack of a comparator who was treated more favorably is not necessary to establish a Title VII claim. (Doc. 34 at 16-17). As a general rule, Kent is correct, that, in some circumstances, a plaintiff can establish a *prima facie* Title VII case without showing the existence of a comparator. *Hand*, 304 F. Supp. 3d at 1179 (citing *Walker v. Love's Travel Ctr.*, No. 17-0298-WS-M, 2017 WL 4931693, at *2 (S.D. Ala. Oct. 31, 2017) (explaining that allegations about a comparator are unnecessary at the motion to dismiss stage because a plaintiff can establish a prima facie Title VII claim at the summary judgment stage without reference to a comparator). *Hand* and *Walker* are distinguishable from this case. Both *Hand* and *Walker* declined to dismiss a complaint based on the absence of allegations of a comparator. As the court explained in *Walker*, "[t]his is because *McDonnell Douglas*'s burden-shifting framework is an evidentiary standard, not a pleading requirement." *Walker*, 2017 WL 4931693, *2. Instead, to state a claim at the motion to dismiss stage, a plaintiff need only to provide enough factual matter, taken as true, to suggest intentional discrimination. *Id.* This can be done without a comparator. The present case is at the summary judgment phrase, where a

City also asserts that it is undisputed that it had a legitimate, non-discriminatory reason for any adverse employment action taken against Kent.  (*Id.*).

### 1. Kent's April 4, 2017 Two-Day Suspension for Failing to Keep the Grounds Secure

Bradford disciplined Kent on April 4, 2017, by suspending him for two days when Kent failed to report an open gate and broken glass and nails in the Arlington House parking lot.  (Doc. 39-9 at 3 & doc. 30-11 at 2).   However, Kent appealed, and the discipline was rescinded through a settlement agreement, signed by counsel for Kent and an attorney for the City.  (Doc. 30-11 at 2-3).  To state a Title VII discrimination claim, an "adverse employment action" must be "a *serious and material*; change in the terms, conditions, or privileges of employment." *Crawford v. Carroll*, 529 F.3d 961, 970-71 (11th Cir. 2008) (quoting *Davis v. Town of Lake Park, Fla*., 245 F.3d 1232, 1239 (11th Cir. 2001)).   Ultimate employment decisions, such as termination, demotion, and failure to hire, are adverse employment actions. *Id*. at 970. If a plaintiff relies on employment actions less severe than an ultimate employment decision to support a discrimination claim, he or she must show that the action substantially altered his or her "compensation, terms, conditions, or privileges of employment, deprive[d] him or her of employment opportunities, or adversely affect[ed] his or her status as an employee." *Id*. (quoting *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000)).

Kent offers no evidence to show that the rescinded April 4, 2017 two-day suspension meets the requirements of an adverse employment action.  Furthermore, even if it did, the evidence shows the City had a legitimate, non-discriminatory reason to discipline Kent in this situation, as part of

---

plaintiff is required to point to evidence of discrimination and/or retaliation.  As explained throughout this opinion, Kent has not pointed to sufficient evidence to support his claims, whether comparator evidence or other evidence.

his job duties included patrolling and inspecting the grounds, and reporting evidence of unauthorized entry, vandalism, or theft.  This rescinded suspension does not support his disparate treatment race discrimination claim.

### 2. Kent's January 20, 2017 Ten-Day Suspension for Leaving the Grounds Without Permission

In January 2017, Bradford disciplined Kent for two instances where Kent failed to report being away from the grounds to his supervisor, by suspending him for ten days.  (Doc. 30-9 at 2-3).  A determination was held, and Kent did not appeal.  (*Id.*).   Kent points to no evidence of people outside of his protected class not being disciplined for similar conduct.  Furthermore, the evidence shows the suspension was warranted and there is no evidence of pretext.

### 3. Kent's July 20, 2017 Six-Day Suspension for Feeding Stray Cats and Damage to a City Vehicle

On July 20, 2017, Kent received a Decision Upon Determination Hearing, which stated he was suspended without pay for six days for failure to comply with his supervisor's instructions. (Doc. 30-7 at 9).  Specifically, on Friday July 6, 2017, Bradford arrived at Arlington and found Kent feeding stray cats – a direct violation of Arlington House rules.  (*Id.*).  That same day, another employee went to use a city vehicle, and there were nails in the front and back passenger tires. (*Id.*).  Kent reported that he did not see the damage, even though it was his job to make sure the grounds and equipment were secure.  (*Id.*).  During the hearing, Kent admitted to feeding the cats after being told on several occasions not to feed them.  (*Id.*).  For this reason, Kent was suspended for six days.   (*Id.*).   Kent appealed, and the Jefferson County Personnel Board upheld the disciplinary action, but reduced the suspension to four days and issued two days back pay.  (Doc. 30-13 at 2).  Again, the evidence shows that the City had a legitimate reason for disciplining Kent, and there is no evidence that such discipline was racially-motivated.

### 4.  Kent's September 20, 2018 Fifteen-Day Suspension for Sleeping on Duty

On August 25, 2018 and August 27, 2018, Kent was alleged to have been found sleeping during his assigned shift.  (Doc. 30-7 at 10).  Kent denied he was sleeping, but claimed he suffers from narcolepsy and seizures, and that on August 25, 2018 and August 27, 2018, he had seizures.  (*Id.*).  Kent had never informed Arlington House of these conditions.  (*Id.*). Director Richards suspended Kent for fifteen days.  (*Id.*).  Kent appealed.  Although there was evidence to support the allegation that Kent was sleeping on August 27, 2018, there was no evidence presented to support the August 25, 2018 allegation.  (*Id.*).  Therefore, the hearing officer recommended the fifteen-day suspension be reduced to ten days.  (Doc. 30-15 at 2).  The Jefferson County Personnel Board upheld the disciplinary action, including reducing the suspension to ten days.  (Doc. 30-15 at 2).

Attempting to show that a member outside his protected class was treated differently, Kent points to his December 14, 2017 complaint to Director Moode alleging that, among other things, Wright was asleep while on duty with a handgun in his lap.  (Doc. 30-14 at 6).  After investigation, Kent's complaint was partially substantiated.  (Doc. 30-2 at 4).  Specifically, photographs showed Wright asleep while on duty, but no weapon could be seen.  (*Id.*).  Director Moode disciplined Wright for this infraction.  (*Id.*).   Because, like Kent, Wright was disciplined for being found sleeping on duty, this does not show that a member outside Kent's protected class was treated differently.  Like the instances above, the evidence shows that the City had a legitimate reason for disciplining Kent, and there is no evidence of any racial motivation.  This suspension does not support a disparate treatment race discrimination claim.

### C.  Retaliation

"Title VII prohibits . . . retaliation against an employee who has opposed any unlawful

employment practices or who has made a charge, testified, assisted, or participated in any manner in a Title VII proceeding." *Sapp v. U.S. Attorney General*,  676 Fed. Appx. 878, 881 (11th Cir. 2017) (citing 42 U.S.C. §§ 2000e-2(a)(1), 2000e-3(a)).   Title VII retaliation claims generally "require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352, 133 S. Ct. 2517, 2528 (2013). Where, as here, a plaintiff relies on circumstantial evidence, the burden-shifting *McDonnell Douglas* framework is the guide. *See Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001). Under this framework, the plaintiff must first make a *prima facie* case of retaliation by presenting evidence (1) he engaged in a statutorily protected activity; (2) he suffered an adverse action; and (3) there is a causal connection between the protected activity and the adverse action. *See Brown v. Ala. Dept. of Transp.*, 597 F.3d 1160, 1181 (11th Cir. 2010).   The retaliation is material if it "well might have dissuade[d] a reasonable worker from making or supporting a charge of discrimination."  *Crawford v. Carroll*, 529 F.3d 961, 974 (11th Cir. 2008) (citing *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 57 (2006)).  If the plaintiff establishes a *prima facie* case, this triggers the defendant's burden of articulating a legitimate, non-retaliatory reason for the adverse employment action. *Pennington*, 261 F.3d at 1266. If the defendant satisfies its burden, then the plaintiff must provide sufficient evidence the defendant's proffered reason is merely a pretext for retaliation. *Id.*

In his August 7, 2017 EEOC Charge, Kent alleges his July 2017 suspension for feeding stray cats was retaliatory "for objecting to the continued harassment and hostile work environment inflicted . . . by [Kent's] supervisor and co-workers."  (Doc. 20 at 34).  In his November 28, 2017 EEOC Charge, Kent marks the boxes for both race discrimination and retaliation.  (Doc. 30-4 at 124).  In this second charge, Kent complains that on August 12, 2017, Bradford shouted at him

and called him a "punk bitch." (*Id.*). Kent also complains that on August 18, 2017, he was unable to clock-in for his scheduled shift and had a similar issue on the next shift. (*Id.*). On August 22, 2017, Kent received an email from the payroll director, informing him that there was no time clock record for his August 10, 2017 shift. (*Id.*). Kent also complained that on November 2, 2017, Bradford cursed at him as he was leaving, saying to "get my punk ass out of the way, bitch." (*Id.*). Finally, Kent complained about not receiving his check stubs. (*Id.*).

As discussed above, Kent's suspension for feeding stray cats was upheld, (doc. 30-13 at 2). The evidence shows that the City had a legitimate reason for disciplining Kent, and there is no evidence that such discipline (or any other discipline Kent received) was retaliatory in nature. As to the complaints in Kent's second EEOC Charge, taken singularly or in the aggregate, none of these constitute a materially adverse action. To satisfy the adverse employment action requirement for a retaliation claim, a plaintiff must show that "a reasonable employee would have found the challenged action materially adverse." *Burlington Northern*, 548 U.S. at 68. An action is said to be "materially adverse" if it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* Kent's minor inconveniences regarding delayed pay stubs, having to verify the hours he worked, and rough language from Bradford are the type of "petty slights or minor annoyances that often take place at work and that all employees experience." *Id.* Kent has not stated a *prima facie* case for retaliation related to the complaints in his second EEOC Charge.[12] Summary judgment is due on this claim.

---

[12] Kent's briefing on his retaliation claim is insufficient. (*See* doc. 34 at 17-18). Kent includes one paragraph on the general rule that Title VII prohibits retaliation for opposing an unlawful employment practice or participating in any investigation, proceeding, or hearing. (*Id.* at 17). Kent then asserts that he complained to his supervisor and Human Resources about alleged discrimination. (*Id.*). He says his first report was in December 2019, which appears to be a typo, because he also asserts he reported other incidents around July 2017. (*Id.*). He then concludes that, with regard to the incidents that occurred in 2017, he made numerous complaints

24

## IV. Conclusion

For the reasons stated above, there are no genuine issues of material fact and the City is entitled to judgment as a matter of law.  The City's motion for summary judgment (doc. 30) is **GRANTED**.  A separate order will be entered.

DONE this 27th day of August, 2020.

_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE

---

about Bradford and other's behavior to Human Resources.  (*Id.* at 17-18).  Kent makes no arguments about adverse actions, causation, or pretext to overcome the City's assertion of legitimate non-retaliatory reasons for its actions.